CITY OF DETROIT, a municipal corporation, and Coleman A. Young, individually and as Mayor, City of Detroit, Plaintiffs,

v.

Barbara H. FRANKLIN, Secretary of Commerce of the United States, and Barbara Bryant, Director of the United States Bureau of the Census, Defendants.

No. 91–CV–73672–DT.

United States District Court,
E.D. Michigan, S.D.

Aug. 14, 1992.

David M. Glass, Dept. of Justice, Washington, D.C., for plaintiffs.

Ulysses W. Boykin, Detroit, Robert A. Sedler, Wayne State University, Law School, Detroit, for defendants.

## MEMORANDUM OPINION
## AND ORDER

ZATKOFF, District Judge.

In this suit challenging the results of the 1990 decennial census, the Court grants the defendants' motions for summary judgment for three independent reasons. First, the plaintiffs lack standing to sue because there is no causal link between their claimed injuries and the challenged conduct. Second, the plaintiffs lack standing to sue because they fail to cite any constitutional right for the violation of which the Court may grant a remedy. Third, even if the plaintiffs could overcome the first two hurdles, they fail to cite enough evidence under Rule 56 of the Federal Rules of Civil Procedure to support their claim.

### I.  FACTS

Plaintiffs, the City of Detroit and its mayor, Coleman A. Young, bring this suit against the Secretary of Commerce and the Director of the United States Bureau of the Census (collectively: the Census Bureau), alleging that the Census Bureau violated Article I, section 2, clause 3 of the United States Constitution (the apportionment clause) by failing "to conduct the most accurate census that it is reasonably possible to conduct." Plaintiffs' Response to Defendants' Motions for Summary Judgment (Plaintiffs' Response), at 20. Plaintiffs claim that the Census Bureau's alleged constitutional violation has caused them to lose representation in the House of Representatives and a fair share of federal and state funds allocated on the basis of the census figures. In Count I of their complaint (the undercount claim), plaintiffs allege that the Census Bureau's counting methods failed to account for significant numbers of Detroit residents. Hence, they ask the Court to order the Census Bureau to develop a plan to correct the alleged undercount. In Count II (the statistical adjustment claim), plaintiffs say that the Census Bureau's allegedly flawed methods failed to account for a higher rate of blacks than of whites. Accordingly, they ask the Court to order the Census Bureau to adjust the population count throughout the state

of Michigan to correct the disproportionate undercount of blacks.

The Census Bureau moves for summary judgment as to each count of plaintiffs' complaint. Plaintiffs filed response briefs, to which defendants replied. In addition, the Court ordered plaintiffs and defendants to file supplemental briefs, and allowed defendants, as movants, to file a final supplemental reply brief. Pursuant to E.D.Mich. Local R. 7.1(e)(2), the Court orders that the motions be submitted and determined on the briefs without oral argument.

With regard to the undercount claim, the Census Bureau seeks summary judgment on two grounds, each of which implicate issues of standing. First, it asserts that plaintiffs do not have standing to bring this suit because they fail to cite sufficient evidence showing a fairly traceable causal connection between their alleged injuries and the Census Bureau's counting methods. Second, the Census Bureau asserts that, if the Court orders it to recount the population of Detroit, the Court would also have to order it to recount the population of the entire United States so as not to prejudice other states and units of local government, for any increase in the number of Michigan's seats in the House of Representatives would come at the expense of some other state, and any increase in federal funding for Detroit would come at the expense of other states and units of local government. Therefore, the Census Bureau argues that the Court must deny the injunctive relief plaintiffs seek—a recount—because such relief is so unrealistic that it defeats standing to litigate the case on the merits.

With regard to the statistical adjustment claim, the Census Bureau claims that the Court should grant summary judgment against plaintiffs for two reasons. First, the Census Bureau argues that plaintiffs simply fail to cite any constitutional right for the violation of which the federal courts may grant a remedy. Second, it asserts that, even if the Court holds that plaintiffs have identified some judicially enforceable federal right, the undisputed facts show

that the Census Bureau's decision not to make a statistical adjustment to the population count was not arbitrary and capricious.

Although the parties treat each count of plaintiffs' complaint as a separate claim, the Court notes that plaintiffs assert a single constitutional claim, yet seek two different forms of relief. Plaintiffs allege a violation of the apportionment clause, and ask the Court to order the Census Bureau to correct the violation, either by recounting or by statistically adjusting the population count.[1] Accordingly, the various parts of the Court's analysis focus on, and apply equally to, the single alleged constitutional claim.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Blakeman v. Mead Containers*, 779 F.2d 1146 (6th Cir.1985); Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In applying this standard, the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Cook v. Providence Hosp.*, 820 F.2d 176, 179 (6th Cir.1987); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

## III.  DISCUSSION

Initially, the Court notes that plaintiffs do not contend that the Census Bureau set out to undercount Detroit residents or blacks or the poor or any identifiable group. Rather, they merely allege that the Census Bureau unintentionally undercounted poor people, a group which holds a disproportionate number of blacks, throughout the United States. Indeed, plaintiffs' claims for relief rest solely on the apportionment clause, U.S. Const. Art. I, § 2, cl. 3. Plaintiffs' Response, at 8–9.

The apportionment clause of the original constitution reads as follows:

> Representatives ... shall be apportioned among the several States ... according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons ... and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

The fourteenth amendment later changed the first sentence of the apportionment clause to read as follows:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.

U.S. Const.Amend. XIV, § 2.

Plaintiffs assert that the apportionment clause, as amended, confers on them a right to seek judicial review of the Census Bureau's statistical methodology. In support of their argument, plaintiffs note that in *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–30, 11 L.Ed.2d 481 (1964), a congressional reapportionment case, the Supreme Court held that the apportionment clause "means that as nearly as practicable one man's vote in a congressional election is to be worth as much as another's." Plaintiffs also cite a number of later con-

---

**1.** Although it appears that plaintiffs ask the Court to order both a recount and a statistical adjustment, either form of relief, if granted, would redress the alleged injuries of underfunding and political under-representation.

gressional reapportionment cases which hold that the "as nearly as practicable" standard announced in *Wesberry* requires a state to make a "'good-faith effort to achieve precise mathematical equality'" in determining the population of its electoral districts, so as to ensure equal voting power for every voter. *Karcher v. Daggett*, 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983) (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969)). Plaintiffs then assert that the "one man, one vote" principle which the Supreme Court found implicit in the apportionment clause applies equally to the Census Bureau, requiring it to count, as nearly as practicable, all persons. Thus, plaintiffs argue, because the Census Bureau concedes that it undercounted the entire population, and that it undercounted a higher percentage of poor people than others, it violated the "one man, one vote" principle.

## A. STANDING TO SUE

As a threshold matter, plaintiffs must establish standing to sue. Principles of standing derive from constitutional requirements and prudential considerations.

The constitutional requirements stem from Article III of the Constitution, which reads as follows: "[t]he judicial Power shall extend to ... Cases ... [and] Controversies...." U.S. Const. Art. III, § 2. Standing requirements ensure that the case at issue "will be presented in an adversary context and in a form historically capable of judicial resolution." *Young v. Klutznick*, 652 F.2d 617, 623, (6th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982) (quoting *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)). In this way, federal courts are insulated from "ill-defined controversies over constitutional issues" and hypothetical or abstract cases. *Young*, 652 F.2d at 623 (citations omitted).

■ Self-imposed judicial restraints supplement constitutional standing requirements. These restraints apply when "prudential considerations militate against invocation of the judicial process." *Id.* To establish standing a plaintiff must also show a fairly traceable causal nexus between the claimed injury and the challenged conduct, and the existence of a remedy for redress of the claimed injury. *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72–73, 98 S.Ct. 2620, 2629–30, 57 L.Ed.2d 595 (1978).

In sum, under Article III and *Duke Power*, to establish standing a plaintiff must identify and prove a real injury, its cause, and an available and workable judicial remedy. Plaintiffs have failed to meet their burden in two ways.

### 1. Lack of Causal Nexus

■ First, plaintiffs lack standing to sue because they cannot establish a causal connection between their claimed injuries and defendants' conduct. Plaintiffs argue that their injuries—political under-representation and underfunding—flow from the Census Bureau's allegedly faulty methodologies and refusal to adjust statistically the population count. The Court notes, however, that the Census Bureau neither creates state and federal legislative districts nor prescribes legislative spending. Those duties are reserved to the Michigan state legislature and Congress. Therefore, the conduct of intervening third parties, not the actions of the defendants, are directly responsible for plaintiffs' claimed injuries.

The Sixth Circuit reached a similar conclusion in *Young*. In *Young*, the plaintiffs asserted an almost identical constitutional claim against the Census Bureau in relation to the 1980 decennial census. The court found, among other things, that "[i]f the Michigan legislature may adjust for the undercount, whether the injuries feared by plaintiffs do in fact arise does not depend upon defendants' actions." 652 F.2d at 624. The court further found that "[a]n independent third party, the Michigan state legislature, would play a necessary role in determining the effects of the census upon the plaintiffs." *Id.* The same is true here. Plaintiffs' claimed injury relating to political under-representation results not from the Census Bureau's alleged undercount, but rather from the failure of the Michigan

state legislature to adjust the census numbers for purposes of apportionment. In the same way, plaintiffs' claimed injury relating to underfunding flows not from the Census Bureau's actions, but rather from the refusal of both the Michigan state legislature and Congress to adjust the census count when allocating and spending public funds.[2]

Perhaps the Court would reach a different conclusion if both the Michigan state legislature and Congress were obligated to accept unadjusted census figures, but they are not. *See Young*, 652 F.2d at 624 ("There is no reason to believe that states would not be free to adjust census figures for redistricting in the census year, as long as the adjustment is 'thoroughly documented' and applied in a 'systematic' manner." (citations omitted)); *see also* 1990 Department of Commerce Information Bulletin (unrebutted Exhibit A to Defendants' Supplemental Brief) (federal grant programs do not necessarily rely on specific census data).

Plaintiffs attempt to overcome their standing deficiency by arguing that *Young*'s causation analysis has been rejected by the Supreme Court. Specifically, plaintiffs argue that the Supreme Court in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), held that the apportionment clause imposes an obligation on states to use only the official population count as determined by the Census Bureau in reapportioning congressional representation within a state. Plaintiffs suggest that *Karcher* effectively overrules *Young* on the issue of causation.

■ Plaintiffs misconstrue the import of *Karcher*. The holding in *Karcher* is much broader than suggested by plaintiffs. The Court in *Karcher* did not hold that the states must use census figures to reapportion congressional representation. The Supreme Court merely reiterated a well-established rule of constitutional law: states are required to use the "best census data avail-

able" or "the best population data available" in their attempts to effect proportionate political representation. 462 U.S. at 731, 103 S.Ct. at 2659 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 528, 89 S.Ct. 1225, 1227, 22 L.Ed.2d 519 (1969)). Nothing in the constitution or *Karcher* compels the states or Congress to use only unadjusted census figures. *Karcher* does not overrule *Young*.

### 2. Lack of Judicially Manageable Remedy

■ Plaintiffs also lack standing to sue because they fail to cite any constitutional right for the violation of which the Court may fashion a remedy. As the court recognized in *Tucker v. Department of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992), a case nearly identical to this one, the apportionment clause simply directs congressional apportionment in accordance with the census. Nothing in the apportionment clause suggests that a person may bring a lawsuit challenging the methods by which the population is counted. Moreover, the reapportionment cases merely authorize the federal courts to review the methods used by a state to divide its population into electoral districts, "so far as that is necessary to assure equal voting power to every voter." *Id.* While the federal courts can use the standard of equality to review the methods a state uses to divide its population into electoral districts, neither the constitution nor Congress suggests a standard with which to review the Census Bureau's statistical methodology. The constitution directs Congress to conduct the census; Congress has delegated the task to the Secretary of Commerce, "in such form and content as he may determine, including the use of sampling procedures and special surveys," 13 U.S.C. § 141(a); and the Census Bureau, an agency within the Department of Commerce, has been entrusted with the duty of taking the census. The implementing statutes fail

---

**2.** The Court does not mean to suggest that it believes Congress and/or the Michigan state legislature should or must adjust Census figures, or that the plaintiffs have a viable or reasonable

claim against another defendant or defendants. The Court raises the point only to demonstrate the lack of a causal connection between the claimed injuries and the defendants' conduct.

to provide the Census Bureau with any guidelines on how to take the census.

The absence of any judicially administrable standard prompted the court in *Tucker* to note that the plaintiffs in that case merely asked the court to take sides in a dispute among statisticians and demographers. The court concluded that the plaintiffs lacked standing because "a case about statistical methodology is a case whose gears fail to mesh with any judicially enforceable rights." 958 F.2d at 1419. The Court agrees with the reasoning of *Tucker*. Accordingly, the Court holds that plaintiffs simply fail to cite any constitutional right for the violation of which the federal courts may shape a remedy. *Cf. Young*, 652 F.2d at 625 n. 8 ("there are many unjust conditions and occurrences, natural and manmade, which federal courts do not have the strength, wisdom or power to remedy in a timely manner").

## B. FAILURE TO PROVE CONSTITUTIONAL VIOLATION

■ Furthermore, even if the Court accepted plaintiffs' argument that the apportionment clause gives them a right to challenge the Census Bureau's statistical methodology, the Court would nonetheless grant summary judgment for the Census Bureau. As noted, the reapportionment cases hold that the apportionment clause requires a state to divide its population so that, as nearly as practicable, every voter in a congressional election is assured equal voting power. *Wesberry*, 376 U.S. at 7–8, 84 S.Ct. at 529–30. Just as the reapportionment cases direct the federal courts to determine whether a state made a good-faith effort to achieve precise mathematical equality in determining the population of its electoral districts, plaintiffs ask the Court to determine whether the Census Bureau made a good-faith effort to count, as nearly as practicable, all Detroiters. *See Cuomo v. Baldridge*, 674 F.Supp. 1089, 1093 (S.D.N.Y.1987) (the question presented in a constitutional challenge to an inaccurate census is whether the Census Bureau "develop[ed] and implement[ed] procedures which were reasonably designed to count as nearly as practicable all those

persons residing in the United States on Census Day"). The undisputed facts show that the Census Bureau did just that.

In its motions for summary judgment, the Census Bureau details the procedures it used in conducting the census. The Census Bureau asserts that, by using a variety of procedures, it sought to count as many people as reasonably possible. Although a particular method might not account for everyone, or even for an entire group of people, the Census Bureau asserts that it designed other methods to account for those persons missed. It asserts that its many procedures created "layers of redundancy," whereby persons missed by one method would be counted using one or more other methods. After describing at length the procedures used in taking the 1990 census, the Census Bureau asserts that plaintiffs cannot cite enough evidence to support their claim that the Census Bureau did not make a good-faith effort to count, as nearly as practicable, all Detroiters. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (a defendant seeking summary judgment satisfies its initial burden by adequately showing why it believes the plaintiff cannot establish an essential element of its prima facie case).

In response to the Census Bureau's motions for summary judgment, plaintiffs point to three alleged deficiencies in the Census Bureau's procedures. First, plaintiffs contend that because the Census Bureau based its address control file (ACF) on an address list it purchased from a commercial vendor, it did not make a good faith effort to count, as nearly as practicable, all Detroit residents, for many low income people likely would not appear on such a list. Second, plaintiffs contend that one of the procedures used by the Census Bureau to update and refine the ACF, the Advance Post Office Check (APOC), failed to account for substantial pockets of low income people, because the post office allegedly does not deliver mail to a number of areas in Detroit. Third, plaintiffs assert that the Census Bureau's decision not to make a statistical adjustment to the population of

the entire United States—to try to account for people missed by census takers, and especially to correct the racially disproportionate undercount—shows that the Census Bureau did not undertake a good faith effort to account for all Detroiters. Although plaintiffs allege in their complaint that the Census Bureau's methods contained several other flaws, they cite no evidence supporting those allegations. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (once a defendant seeking summary judgment satisfies its initial burden by adequately showing why it believes the plaintiff cannot establish an essential element of its prima facie case, the burden shifts to the plaintiff to show that its evidence is sufficient to establish the element).

To support their allegation that the ACF suffered from severe defects, because the Census Bureau based the ACF on a list it bought from a commercial vendor and because the APOC failed to account for all low income Detroit residents, plaintiffs make a number of promises to produce evidence at trial, *see* Plaintiffs' Response, at 23 ("defendants will have the opportunity to refute each of [plaintiffs'] allegations at the trial, *after the plaintiffs have presented their evidence.* It is at that time and at that time only that this Court can decide how 'speculative' the plaintiffs [sic] claim that a serious 'miscount' occurred in the City of Detroit really is"), at 25 ("it is the contention of the plaintiffs, which they will prove at trial, that the 'layers of redundancy' were not effective"), and at 26 ("plaintiffs will identify [areas where mail is not delivered] at the trial of the case and show that they do in fact exist"); yet, plaintiffs cite only the results of a single telephone survey conducted by the Michigan Consolidated Gas Company (the MichCon survey), and several drawings based on those results. Plaintiffs' evidence is simply insufficient to support their claim that the Census Bureau breached its duty under the apportionment clause to conduct in good faith an accurate count of Detroit residents.

Plaintiffs contend that the MichCon survey "identified a number of areas in the City of Detroit, where people were living (since they were customers of Michigan Consolidated Gas Company), but did not receive census forms, because their addresses were not on the [ACF]...." Plaintiffs' Response, at 27. Even if the Court accepts the MichCon survey's results as an accurate picture of the number of Detroiters counted by the Census Bureau at the time MichCon took the survey, notwithstanding plaintiffs' failure to offer much more than the raw statistics which MichCon collected, the survey nonetheless fails to establish that the Census Bureau undercounted Detroiters, because MichCon took the survey before the Census Bureau had completed the census. Indeed, the Census Bureau did not finish counting Detroit residents for several months after MichCon made its telephone survey. The Census Bureau still had not finished the Nonresponse Follow–Up, a procedure in which census takers first visited or telephoned up to six times housing units that had not yet returned completed questionnaires, and then tried to obtain information from neighbors or building managers. Nor had the Census Bureau completed the "Were You Counted?" campaign, in which the Census Bureau asked units of local government, the media, and community-based organizations to encourage those who thought the Census Bureau had not counted them to call toll-free telephone numbers or to report data for their household on forms printed in the newspapers. Nor had the Census Bureau conducted the Housing Coverage Check, in which the Census Bureau ran a computer search of the data it had collected, and compared the results with data obtained in the 1980 census and with recent population estimates, to determine whether the count of any communities or census blocks appeared low. Finally, the Census Bureau had still not undertaken the Postcensus Local Review, whereby the Census Bureau gave units of local government updated maps of the census blocks in their communities and a chance to challenge the count of any housing unit or block. In short, plaintiffs simply cite no

evidence which shows that the people surveyed by MichCon were not counted later. The sparsity and timing of the MichCon survey virtually destroy its probative value and render it a mere scintilla of evidence, speculative at best, in support of plaintiffs' argument. Accordingly, under Rule 56 of the Federal Rules of Civil Procedure, the MichCon survey fails to support plaintiffs' claim that the Census Bureau breached its duty under the apportionment clause to conduct in good faith an accurate count of Detroit residents.

Finally, plaintiffs quarrel with the Census Bureau's decision not to make a statistical adjustment to the population of the entire United States to try to account for people missed by the census takers, and especially to try to correct the racially disproportionate undercount. In support of their contention that the Census Bureau breached its duty under the apportionment clause to make a good-faith effort to count all Detroiters, as nearly as practicable, plaintiffs promise that "[a]t the trial of the present case, [they] will demonstrate that beyond question, within the State of Michigan, an adjustment for the racially differential undercount will produce an official population count which ... is 'closer to the truth' than an official population count based on the raw unadjusted census data alone." Plaintiffs' Response, at 43–44. Plaintiffs also promise that "expert witnesses will testify that this result would obtain under *any* method of adjustment...." *Id.* at 44. Yet, plaintiffs neglect to say how they will show that a statistical adjustment produces a more accurate census count. Further, they fail to identify the expert witnesses who will say that *"any"* statistical adjustment will produce a better count. Hence, plaintiffs' promises to offer enough evidence later appear empty. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (a plaintiff seeking to avoid summary judgment bears the burden of coming forward with evidence in support of its claim).

It seems from a careful reading of Plaintiffs' Response that, in opposing the Census Bureau's motion, plaintiffs rely primarily on statements made by the Secretary of Commerce (the Secretary). *See* Plaintiffs' Response, at 42. In deciding not to make a statistical adjustment to the population count of the entire United States, the Secretary made the following statement:

Based on the measurements so far completed, the Census Bureau estimated that the proportional share of about 29 states would be made more accurate and about 21 states would be made less accurate by adjustment. Looking at cities, the census appears more accurate in 11 of 23 metropolitan areas with 500,000 or more persons[.] .... While these analyses indicate that more people live in jurisdictions where the adjusted counts appear more accurate, one third of the population lives in areas where the census appears more accurate. As the population units get smaller, including small and medium sized cities, the adjusted figures become increasingly unreliable. When the Census Bureau made allowances for plausible estimates of factors not yet measured, these comparisons shifted toward favoring the accuracy of the census enumeration. Using this test, 28 or 29 states were estimated to be made less accurate if the adjustment were to be used.

What all these tests show, and no one disputes, is that the adjusted figures for some localities will be an improvement and for others the census counts will be better. While we know that some will fare better and some will fare worse under an adjustment, we don't really know how much better or how much worse. If the scientists cannot agree on these issues, how can we expect the losing cities and states as well as the American public to accept this change?

Secretary's Decision § 1, at 1–4 to 1–5. Plaintiffs contend that the Census Bureau breached its duty under the apportionment clause to conduct in good faith an accurate count of Detroit residents, because the Census Bureau did not specifically consider adjusting the population of Michigan alone, as opposed to the entire United States. Plaintiffs' Response, at 41–42.

Yet, plaintiffs misread the Secretary's decision. The Secretary's decision expressly rejects plaintiffs' contention.

[I]n attempting to make the actual count more accurate by an adjustment, we might be making the shares less accurate. The shares are very important because they determine how many congressional seats each state gets, how political representation is allocated within states, and how large a "slice of the pie" of federal funds goes to each city and state. Any upward adjustment of one share necessarily means a downward adjustment of another. Because there is a loser for every winner, we need solid ground to stand on in making any changes. I do not find solid enough ground to proceed with an adjustment.

Secretary's Decision § 1, at 1–3 to 1–4.[3]

The evidence in the record indicates overwhelmingly that the Secretary's refusal to make a nationwide or statewide statistical adjustment does not support plaintiffs' claims that the Census Bureau breached a constitutional duty to make a good faith effort to count everyone, including Detroit residents, as nearly as is practicable. In the same way that a national adjustment would create winners and losers, so too would a statewide statistical adjustment. The Secretary's statements make clear that a statistical adjustment would cause a mere shifting of unavoidable inequities and not a net improvement in accuracy. Plaintiffs have failed to produce any evidence to the contrary.

### IV. CONCLUSION

For all of the foregoing reasons, the Court concludes that no genuine issues of material fact exist and that defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment are GRANTED.

IT IS SO ORDERED.

---

**3.** The Secretary's decision discusses the likely effect the census figures will have on reapportionment and funding. In this respect, the Secretary's observations are rooted in history, not law. The decision does not recite, or suggest, a rule that the Michigan state legislature and/or Congress may not adjust census figures before allocating funds or carving legislative districts. As previously noted in this opinion, although the Michigan state legislature and Congress *may* and often do rely on census figures, they are not *required* to do so under existing law.